**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| KIERON JACKSON, | : | |
| | : | Civil Action No. 10-0668 (DRD) |
| Petitioner, | : | |
| | : | |
| v. | : | **OPINION** |
| | : | |
| MICHELLE RICCI, et al., | : | |
| | : | |
| Respondents. | : | |

**APPEARANCES:**

Petitioner <u>pro</u> <u>se</u>                    Counsel for Respondents
Kieron Jackson                      Stephanie Paige Davis-Elson
Northern State Prison               Asst. Prosecutor of Hudson Co.
168 Frontage Road                   595 Newark Avenue
Newark, NJ 07114                    Jersey City, New Jersey 07306

**DEBEVOISE**, District Judge

Petitioner Kieron Jackson, a prisoner currently confined at Northern State Prison in Newark, New Jersey, has submitted a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. The respondents are Administrator Michelle Ricci and the Attorney General of the State of New Jersey.

For the reasons stated herein, the Petition must be denied.

I.  BACKGROUND

A.  Factual Background

The relevant facts are set forth in the opinion of the Superior Court of New Jersey, Appellate Division.[1]

> The convictions stem from a string of armed robberies of Chinese restaurants in Jersey City and Bayonne in November and December 2001.  One restaurant was victimized four times.

> The first armed robbery occurred on November 28, 2001, at the Yoan Fong restaurant in Jersey City.  Tony Zhu was working at the restaurant when defendant entered with a gun and demanded money.  Zhu testified that defendant pointed the gun at the employees and said "take the money out, take the money out."  Zhu gave defendant money from the register, and defendant left.  Zhu did not see defendant's face on that occasion. [fn]

> [fn] Defendant was acquitted of this charge.

> Defendant returned to Yoan Fong two days later.  Zhu was again working at the restaurant.  He testified that defendant came in, pointed a gun at him, and demanded money.  Zhu gave defendant the money from the register and defendant left.  Defendant returned to Yoan Fong again on December 6, 2001.  On this occasion, defendant climbed over the counter near the front of the restaurant and came to the back where the employees were eating.  Defendant pointed a gun at the employees and demanded money, and again Zhu provided money from the register and defendant left.

> Zhu testified that during the November 30 and December 6, 2001 incidents, he was able to see defendant's face in the course of the robberies.  Zhu

---

[1] Pursuant to 28 U.S.C. § 2254(e)(1), "In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct.  The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence."

also recognized defendant as a customer in the restaurant "once or twice." He was able also to identify defendant in a photo array and at trial.

On the evening of December 22, 2001, defendant returned to Yoan Fong. On this occasion, Yun Yang, delivery person for the restaurant, was on his bicycle returning to the restaurant after making a delivery. Defendant stopped Yang on the sidewalk in front of the restaurant, demanded money, and struck Yang on the forehead and the back of the head with a gun. Yang fell to the ground, and defendant then pointed the gun at Yang's right temple and neck. Yang then provided defendant with the twenty dollars he had in his possession. Defendant searched Yang for more, and upon finding nothing, left. Yang testified that he had seen defendant in the restaurant "many times," and identified defendant from a photo array and at trial.

Also on December 22, 2001, defendant robbed the Cheun Xing restaurant in Jersey City. At the time of the robbery, Li Li Xu, the owner of the restaurant was in her second-floor apartment directly above the restaurant. Xu observed the robbery occurring via a monitor in her apartment that displayed the video of a security camera in the restaurant. Upon seeing the robbery in progress, Xu ran downstairs with a phone, saw defendant leaving, and called the police. Xu authenticated the video recording at trial before it was played for the jury.

On December 28, 2001, defendant committed robberies number six and seven. First, at approximately 10 p.m., defendant entered the Neptune Café in Jersey City, also owned by Li Li Xu. Xu was working that evening, and observed defendant enter, armed with a gun. Although defendant covered his face with a mask, Xu saw defendant's clothing, including a black jacket with a pattern on the back. Xu watched as defendant struck two of her employees, took money, and left the restaurant. Xu also authenticated a video of this robbery, taken by a security camera in the restaurant, which was likewise played for the jury.

Defendant's second robbery of the evening took place at the Kung Hing restaurant in Bayonne. At approximately 11 p.m., Xiaomin Chen and his sister were working in the Kung Hing restaurant when defendant

3

entered, wearing a ski mask and holding a gun. According to Chen, defendant ran into the restaurant, ordered Chen to open the cash register, hit Chen on the head with the gun's handle, and again ordered Chen to open the register. When Chen complied, defendant grabbed the cash and ran. Chen testified at trial that defendant was wearing blue jeans during the robbery and that he was sure that defendant was the man that robbed the restaurant.

On December 29, 2001, the day after the last two robberies, Officer Al Roesinger of the Bayonne police and his partner were on patrol when they observed a black Honda Accord double-parked on the street with no occupants. A mobile computer check revealed that the plate was assigned to a white Oldsmobile rather than a black Honda, so the officers checked the vehicle identification number, called for back-up units and waited for the driver to return to the vehicle. About five minutes later, four people entered the vehicle. Before the car drove off, the officers approached and conducted a motor vehicle "stop." The officers observed a male and a female juvenile in the rear of the vehicle, defendant in the driver's seat, and co-defendant Lance Rose in the passenger seat. The officers placed the individuals under arrest and searched the vehicle. Rose and the male juvenile were in possession of handguns, one of which was a fake. The search also revealed a ski mask and a black BB gun. The BB gun was discovered between the driver's seat and the console of the vehicle.

At the time of defendant's arrest, he was wearing a black jacket. Li Li Xu identified the jacket as the same one worn by the man who robbed the Neptune Café. After defendant's arrest, he was taken to the Bayonne Police Department Detective Bureau and interviewed by Detective William Nide. Defendant was informed of his rights, and signed a waiver statement. Defendant then provided Detective Nide with a formal statement. Defendant's statement described the robbery of the Kung Hing restaurant. After defendant gave his statement to Detective Nide, he was again advised of his rights, waived them, and provided another formal statement to Detective George Moore of the Jersey City Police. In this second statement, defendant confessed to the robbery of the Neptune Café. Defendant admitted to wearing a black jacket with a sword on the left arm and

4

the word "Avirex" on the back, and hitting someone
"near the head area" during the robbery.  Defendant
also admitted to committing other robberies of Chinese
restaurants using a black BB gun.  Defendant stated
that he was the get-away driver for the robbery of the
restaurant on Kennedy Boulevard and Winfield Avenue,
and the back BB gun was used during that robbery as
well.

State v. Jackson, 2005 WL 3005788, *1-*2 (N.J.Super. App.Div.
Nov. 10, 2005)

B.   Procedural History

Following a jury trial in the Superior Court of New Jersey,
Law Division, Hudson County, Petitioner was found guilty of six
counts of first degree robbery contrary to N.J.S.A. 2C:15-1, one
count of third degree aggravated assault contrary to N.J.S.A.
2C:12-1b(7), and one count of second degree conspiracy to commit
armed robbery contrary to N.J.S.A. 2C:5-2 and N.J.S.A. 2C:1501.
He was acquitted of one count of armed robbery.  The trial court
imposed an aggregate sentence of forty years' imprisonment,
subject to the No Early Release Act, N.J.S.A. 2C:43-7.2.

On direct appeal, the Superior Court of New Jersey,
Appellate Division, affirmed the conviction, but remanded for
reconsideration of the sentence.  State v. Jackson, 2005 WL
3005788 (N.J.Super. App.Div. Nov. 10, 2005).  On January 23,
2006, the trial court resentenced Petitioner, again to an
aggregate term of forty years' imprisonment, subject to the No
Early Release Act.  (Ans., Ex. 15.)  Petitioner appealed the new
sentence as excessive, which the Appellate Division affirmed on

5

Oct. 22, 2008.  (Ans., Ex. 24.)  It does not appear that Petitioner ever sought certification, on these direct appeals, from the Supreme Court of New Jersey.

On February 1, 2006, Petitioner filed with the trial court his first state petition for post-conviction relief, asserting that he had received ineffective assistance of counsel.  Without granting an evidentiary hearing, the trial court denied relief on October 10, 2006.  (Ans., Ex. 22.)  On January 8, 2009, the Appellate Division affirmed the denial of PCR relief, State v. Jackson, 2009 WL 36393 (N.J.Super. App.Div. Jan. 8, 2009), and on April 23, 2009, the Supreme Court of New Jersey denied certification, State v. Jackson, 199 N.J. 133 (April 23, 2009).

On June 23, 2009, Petitioner filed his second state petition for post-conviction relief, raising claims of error in admitting certain evidence, prosecutorial misconduct, and ineffective assistance of trial, appellate, and post-conviction relief counsel.  On August 25, 2009, the trial court denied relief, finding that all of Petitioner's claims were procedurally barred under state law.  (Ans., Exs. 56, 57.)

Petitioner has filed a third state petition for post-conviction relief, raising claims not pertinent here, which remains pending.

This Petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254 followed.  Here, Petitioner originally asserted two

claims for relief: ineffective assistance of trial counsel and ineffective assistance of post-conviction-relief counsel. Petitioner requested a stay of this proceeding in order to exhaust in state court his claim of ineffective assistance of PCR counsel. Because ineffective assistance of state PCR counsel is not a ground for federal habeas relief, see 28 U.S.C. § 2254(i), this Court denied the request for stay and ordered Respondents to answer with respect to the claim of ineffective assistance of trial counsel, only. Respondents have answered, Petitioner has replied, and this matter is now ready for decision.

## II.  28 U.S.C. § 2254

As amended by the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), 28 U.S.C. § 2254 now provides, in pertinent part:

> (a) The Supreme Court, a Justice thereof, a circuit judge, or a district court shall entertain an application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States.

> With respect to any claim adjudicated on the merits in state court proceedings, the writ shall not issue unless the adjudication of the claim

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

7

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

A state court decision is "contrary to" Supreme Court precedent "if the state court applies a rule that contradicts the governing law set forth in [Supreme Court] cases," or "if the state court confronts a set of facts that are materially indistinguishable from a decision of th[e] Court and nevertheless arrives at a result different from [the Court's] precedent." Williams v. Taylor, 529 U.S. 362, 405-06 (2000) (O'Connor, J., for the Court, Part II). A state court decision "involve[s] an unreasonable application" of federal law "if the state court identifies the correct governing legal rule from [the Supreme] Court's cases but unreasonably applies it to the facts of the particular state prisoner's case," and may involve an "unreasonable application" of federal law "if the state court either unreasonably extends a legal principle from [the Supreme Court's] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply," (although the Supreme Court expressly declined to decide the latter). Id. at 407-09. To be an "unreasonable application" of clearly established federal law, the state court's application must be objectively unreasonable. Id. at 409. In determining whether the state court's application

8

of Supreme Court precedent was objectively unreasonable, a habeas court may consider the decisions of inferior federal courts. Matteo v. Superintendent, 171 F.3d 877, 890 (3d Cir. 1999).

Even a summary adjudication by the state court on the merits of a claim is entitled to § 2254(d) deference. Chadwick v. Janecka, 302 F.3d 107, 116 (3d Cir. 2002) (citing Weeks v. Angelone, 528 U.S. 225, 237 (2000)). With respect to claims presented to, but unadjudicated by, the state courts, however, a federal court may exercise pre-AEDPA independent judgment. See Hameen v. State of Delaware, 212 F.3d 226, 248 (3d Cir. 2000), cert. denied, 532 U.S. 924 (2001); Purnell v. Hendricks, 2000 WL 1523144, *6 n.4 (D.N.J. 2000). See also Schoenberger v. Russell, 290 F.3d 831, 842 (6th Cir. 2002) (Moore, J., concurring) (and cases discussed therein). In such instances, "the federal habeas court must conduct a de novo review over pure legal questions and mixed questions of law and fact, as a court would have done prior to the enactment of AEDPA." Appel v. Horn, 250 F.3d 203, 210 (3d Cir. 2001) (citing McCandless v. Vaughn, 172 F.3d 255, 260 (3d Cir. 1999)). "However, § 2254(e)(1) still mandates that the state court's factual determinations are presumed correct unless rebutted by clear and convincing evidence." Simmons v. Beard, 581 F.3d q158, 165 (3d Cir. 2009).

The deference required by § 2254(d) applies without regard to whether the state court cites to Supreme Court or other

federal caselaw, "as long as the reasoning of the state court does not contradict relevant Supreme Court precedent." <u>Priester v. Vaughn</u>, 382 F.3d 394, 398 (3d Cir. 2004) (citing <u>Early v. Packer</u>, 537 U.S. 3 (2002); <u>Woodford v. Visciotti</u>, 537 U.S. 19 (2002)).

Although a petition for writ of habeas corpus may not be granted if the Petitioner has failed to exhaust his remedies in state court, a petition may be denied on the merits notwithstanding the petitioner's failure to exhaust his state court remedies.  <u>See</u> 28 U.S.C. § 2254(b)(2); <u>Lambert v. Blackwell</u>, 387 F.3d 210, 260 n.42 (3d Cir. 2004); <u>Lewis v. Pinchak</u>, 348 F.3d 355, 357 (3d Cir. 2003).

Finally, a pro se pleading is held to less stringent standards than more formal pleadings drafted by lawyers.  <u>Estelle v. Gamble</u>, 429 U.S. 97, 106 (1976); <u>Haines v. Kerner</u>, 404 U.S. 519, 520 (1972).  A pro se habeas petition and any supporting submissions must be construed liberally and with a measure of tolerance.  <u>See Royce v. Hahn</u>, 151 F.3d 116, 118 (3d Cir. 1998); <u>Lewis v. Attorney General</u>, 878 F.2d 714, 721-22 (3d Cir. 1989); <u>United States v. Brierley</u>, 414 F.2d 552, 555 (3d Cir. 1969), <u>cert. denied</u>, 399 U.S. 912 (1970).


III.  <u>ANALYSIS</u>


10

Here, Petitioner asserts in the Petition, without elaboration, that trial counsel failed to provide effective assistance because police reports were not presented to the trial court.  Respondents assert that this claim was not exhausted.

After the jury returned its verdict, but before sentencing, Petitioner moved for a judgment of acquittal or, in the alternative, for new trial, alleging ineffective assistance of trial counsel.  (Ans., Exs. 4-6.)  Petitioner asserted that his trial counsel:

> never argued his side of the store; did not cross-examine the State's witnesses during the Wade/Miranda hearing; did not argue that Yun Yang's description of his assailant did not match defendant's physical traits; did not move to suppress evidence; did not discuss with defendant a line of defense or investigate the case; never argued that Xiaomin Chen identified a different individual on the night of defendant's arrest; never argued that the police lied in their reports about his identification being made positive; never argued that the police engaged in misconduct regarding his identification; never argued prosecutorial misconduct regarding his identification; never argued that the indictment was invalid because it was not signed by the grand jury foreperson; and never argued to reduce defendant's bail.

State v. Jackson, 2009 WL 36393 at *4.  The trial court denied the motion for acquittal or new trial.

In his pro se petition for state post-conviction relief, Petitioner raised the following claims of ineffective assistance of counsel:

> Trial Counsel failed to adequately investigate case
>
> Trial counsel failed to adequately challenge statements

Trial counsel failed to adequately challenge identification

Trial counsel failed to adequately cross examine victims and detectives during Wade proceeding

Trial counsel failed to adequately cross Detectives during <u>Miranda</u> proceedings

Trial counsel failed to submit any motion to suppress evidence or challenge indictment

(Ans., Ex. 16, Pro Se Petition for Post-Conviction Relief.)

Petitioner's counsel raised the following claims:

A.  TRIAL AND APPELLATE COUNSEL FAILED TO ARGUE THAT THE STATEMENT GIVEN BY THE DEFENDANT WITH RESPECT TO THE ROBBERY OF THE TU HING RESTAURANT IN BAYONNE SHOULD HAVE BEEN SUPPRESSED BECAUSE DEFENDANT WAIVED HIS <u>MIRANDA</u> RIGHTS AFTER GIVING HIS STATEMENT.

B.  DEFENDANT WAS DENIED EFFECTIVE ASSISTANCE OF COUNSEL BECAUSE HIS TRIAL ATTORNEY FAILED TO CROSS-EXAMINE THOROUGHLY THE VICTIMS WITH RESPECT TO THEIR IDENTIFICATION OF THE DEFENDANT.

C.  DEFENDANT WAS DENIED EFFECTIVE ASSISTANCE OF COUNSEL WHEN HE FAILED TO CALL TO THE ATTENTION OF THE JURY THE DISCREPANCIES IN THE DESCRIPTIONS GIVEN BY THE VICTIMS OF THE INDIVIDUAL WHO COMMITTED THESE CRIMES.

D.  DEFENDANT WAS DENIED EFFECTIVE ASSISTANCE OF COUNSEL BECAUSE COUNSEL DID NOT RAISE AS PREJUDICIAL ERROR IN DEFENDANT'S APPEAL THE ADMISSION OF THE PHOTO IDENTIFICATION OF DEFENDANT BY THE VICTIMS INTO EVIDENCE.

E.  DEFENDANT WAS DENIED EFFECTIVE ASSISTANCE OF COUNSEL WHEN HE FAILED TO INCLUDE IN DEFENDANT'S APPEAL ALL OF DEFENDANT'S CLAIMS OF INEFFECTIVE ASSISTANCE OF COUNSEL THAT WERE DENIED BY JUDGE CALLAHAN ON FEBRUARY 25, 2004.

(Ans., Ex. 17, Defense Brief in Support of Petition for Post-Conviction Relief.)

After being denied PCR relief, Petitioner raised the following claims on appeal:

POINT I -      THE LOWER COURT ORDER MUST BE REVERSED SINCE DEFENDANT RECEIVED INEFFECTIVE ASSISTANCE OF TRIAL COUNSEL

A)   TRIAL COUNSEL FAILED TO ARGUE THAT DEFENDANT'S STATEMENT SHOULD HAVE BEEN SUPPRESSED BECAUSE DEFENDANT WAIVED HIS MIRANDA RIGHTS AFTER GIVING THE STATEMENT

B)   TRIAL COUNSEL FAILED TO CROSS-EXAMINE THE VICTIMS THOROUGHLY ON THEIR IDENTIFICATION OF DEFENDANT

C)   TRIAL COUNSEL FAILED TO HIGHLIGHT THE VICTIMS' DISCREPANCIES IN THEIR DESCRIPTIONS OF THE PERPETRATOR

D)   TRIAL COUNSEL FAILED TO FILE MOTIONS TO DISMISS THE INDICTMENT

E)   TRIAL COUNSEL FAILED TO CONDUCT AN ADEQUATE INVESTIGATION

POINT II -     THE LOWER COURT ORDER DENYING THE PETITION MUST BE REVERSED SINCE CUMULATIVE ERRORS BY COUNSEL AMOUNTED TO INEFFECTIVE ASSISTANCE OF COUNSEL

POINT III -    THE LOWER COURT ORDER DENYING THE PETITION MUST BE REVERSED SINCE DEFENDANT RECEIVED INEFFECTIVE ASSISTANCE OF APPELLATE COUNSEL ...

(Ans., Ex. 26, Defense Brief on Appeal of denial of post-conviction relief.)  In the Petition for Certification, Petitioner asserted the same claims raised on appeal.

In response to Respondent's argument that Petitioner had failed to exhaust his state remedies with respect to the claim asserted here that police reports were not presented to the trial court, Petitioner argues that he has exhausted this claim, because it raises the same arguments raised in state court (1) that trial counsel failed to argue that his statement should have been suppressed, because Petitioner did not waive his Miranda[2] rights until after he made his statement and (2) that trial counsel should have challenged the identifications. (Petitioner's Brief and Appendix [14].)  Accordingly, the Court will so construe the Petition and proceed.

Plaintiff's claims of ineffective assistance of trial counsel were rejected in state court.  After correctly identifying the governing standards set forth in Strickland v. Washington, 466 U.S. 668 (1984), the Appellate Division thoroughly evaluated each of Petitioner's claims of ineffective assistance of trial counsel, relying in part on the findings of the trial court in response to Petitioner's post-verdict motion for acquittal or new trial, as well as the denial of the petition for post-conviction relief.

> We synthesize defendant's ineffective assistance of trial counsel arguments into seven contentions: (a) failure to argue that defendant, prior to the reading of his Miranda rights, gave an unconsented, involuntary, and coerced oral statement; (b) inadequate cross-examination of the detectives at the Wade/Miranda

---

[2] Miranda v. Arizona, 384 U.S. 436 (1966).

hearing; (c) inadequate cross-examination of the victims about their identifications of defendant; (d) unjustified stipulation to the erroneous nature of Yun Yang's testimony; (e) failure to highlight the discrepancies in Tony Zhu and Yun Yang's description of the assailant; (f) failure to challenge to the facial validity of the superseding indictment; and (g) inadequate investigation. We will discuss each argument in turn.

### a. The confession

Defendant concedes that there was a pretrial Miranda hearing, but argues that Young failed to argue at that hearing that "defendant's waiver of rights occurred after defendant gave a formal statement to the police." Judge Callahan, who presided over the Wade/Miranda motion as well as the trial, rejected this argument in ruling on defendant's post-trial motion. Reviewing the evidence and the testimony at the hearing, he found that "defendant gave his formal statement to the detective after, underline after, defendant signed the Miranda waiver." The record supports that finding.

The parties stipulated that defendant's arrest occurred on the morning of December 29, 2001, at 1:05 a.m. William Nide, a detective with the Bayonne Police Department, testified at the pretrial hearing about his reading of Miranda rights to defendant prior to the receipt of a formal statement. At 3:29 a.m., defendant acknowledged, in writing, his willingness to waive these rights and to give a formal statement. Defendant admitted his involvement in the robbery that night of the Kung Hing restaurant in Bayonne.

Detective Nide testified that defendant received, and waived, his Miranda rights for a second time prior to the giving of the statement, which began at 4:30 a.m. Detective Nide conceded on cross-examination that defendant did not sign this second waiver of rights until after the completion of the statement. Cross-examination was limited to this point. Young argued the exact point that defendant claims was not argued. The judge permitted the introduction of defendant's statement, concluding that this was a case in which Detective Nide erred on the side of caution and in effect "over-Mirandized" defendant.

Against this background, it is clear that there was nothing unreasonable in Young's performance. Defendant misinterprets the testimony and the evidence. The first exhibit included defendant's signed acknowledgment of his rights. Defendant agreed, in writing, to waive these rights at 3:29 a.m. Even though the formal statement did not commence until 4:30 a.m., the judge believed Detective Nide's testimony that there was a further reading of rights before the statement, and that defendant understood these rights at the time. Defendant signed the statement after an additional review of the document.

It is clear that Young attempted to draw the court's focus to the timing of defendant's signing of the second document. Given the clear evidence that defendant waived his rights one hour earlier, however, there was little else counsel could accomplish. The representation was neither unreasonable nor prejudicial.

As one [of] his "additional errors," defendant argues that "the night [he] was interrogated [he] was never aware of [his] rights." This argument is belied by the credibility of the police testimony and the production of the waiver forms with defendant's signature.

Defendant adds that Young did not investigate defendant's claim that the police officers threatened defendant in order to extract his confession. However, defendant presents vague and conclusory allegations, the equivalent of bald assertions, to support this claim. ... The proponent of an "inadequate investigation" claim "must assert the facts that an investigation would have revealed, supported by affidavits or certifications based upon the personal knowledge of the affiant or the person making the certification." ... Defendant has not made this showing.

Finally, defendant alleges that Young failed to note defendant's initial denial of involvement in the armed robberies. This argument lacks merit. It is clear from the transcripts that Young conducted a vigorous cross-examination of Detectives Nide and Moore. He questioned Nide about the one hour gap between the reading of defendant's <u>Miranda</u> rights and the formal

16

statement. He questioned an unresponsive Moore on the
time lapse between the reading of defendant's rights
and the beginning of the second formal statement. Nide
admitted that there was no tape or video recording of
the initial interrogation. He admitted that defendant
at first denied any involvement in the armed robberies.
During cross-examination and in summation, Young
attacked Nide's failure to record these initial denials
of involvement. Moore admitted that there was some
inconsistency in defendant's descriptions of the
crimes. Young attacked Moore's failure to keep a
comprehensive record of the interrogation.

There was nothing unreasonable in Young's
representation regarding this issue. And, because the
evidence revealed that defendant was administered his
Miranda rights and waived them before any questioning
transpired, there was no violation of the rule laid
down in O'Neill, supra, 193 N.J. at 180-81.

    b. Cross-examination at the Wade/Miranda hearing
    Defendant argues in his PCR petition that Young
failed to adequately cross-examine the detectives at
the Wade/Miranda hearing. This repeats an argument
rejected by Judge Callahan prior to sentencing. As the
judge noted, Young asked for a Rule 104 hearing to
consider (1) the admissibility of defendant's statement
the night of his arrest and (2) the constitutionality
of the photo array procedure by which Yun Yang
identified defendant.

    Judge Callahan heard the latter issue first. To
support the introduction of evidence of Yang's
out-of-court identification, the State produced Jersey
City Detective James Harris. Harris conducted the
independent photo array procedure by which Yang
allegedly identified defendant on January 3, 2002.
Detective Harris presented six photographs to Yang,
with the explanation that "the actor may or may not be
in the photo array." There was no involvement by Harris
in this case prior to this procedure. The procedure
complied with the Attorney General's guidelines. Yang
identified the fourth photograph, defendant's, as his
assailant. He signed the back of the photograph. This
photograph was presented to the jury.

    There was an irregularity in the memorialization
of this procedure. Each of the six photos showed to

17

Yang possessed a Bureau of Criminal Investigation (BCI) number. These numbers (48944, 80771, 77181, 79850, 77181, and 19641) were entered on an evidence card attached to the file. According to this evidence card and Harris's supplemental report, Yang identified 48944 as his assailant. The photo allegedly signed by Yang, however, was marked "104498." The number 48944 did not appear on any of the six photos. Harris reiterated that, notwithstanding this incorrect transcription, defendant was the person depicted on the photo signed by Yang. The "real" 48944 was an unknown individual.

Young cross-examined Harris on this irregularity. Young also questioned Harris about an evidence card pertaining to a separate photo array. This second card displayed both 48944 and 104498. It appears that this card corresponded to a photo array shown to Tony Zhu by a different detective in the Jersey City Police Department. There is no indication in the record, however, of which photo Zhu selected. That detective testified that Zhu picked out a photo of defendant. Of course, Zhu's identification of 104498 would not have aided defendant.

Judge Callahan concluded that the incorrect entry of the BCI numbers was a simple "ministerial mistake." He found Detective Harris credible. There was no doubt that Yang selected defendant's photo. Young's representation did not fall below an objective standard of reasonableness. He attempted to discredit the police department's records and to demonstrate that Yang did not identify defendant as his assailant.

To support the introduction of defendant's statements to the Bayonne and Jersey City Police Departments, the State relied on the testimony of Detective Nide and Detective George Moore. We have previously addressed Young's cross-examination of Detective Nide.

Detective Moore took a second formal statement from defendant at 5:25 a.m. on December 29. Prior to doing so, Moore obtained defendant's waiver of his constitutional rights. In the course of defendant's formal statement, Moore read defendant his rights a second time as "a form of habit." The body of the statement reflected this caution.

The thrust of Young's brief cross-examination was that the State could not produce the official <u>Miranda</u> form signed by defendant prior to the giving of a formal statement. Young asked the judge to preclude the introduction of the first part of defendant's statement-the section preceding Moore's alleged second reading of defendant's rights. The judge credited Moore's testimony and refused.

Trial counsel's representation did not fall below an objective standard of reasonableness on this issue. Faced with strong evidence corroborating defendant's signed waiver of his constitutional rights, Young attacked the statements as best he could. The judge chose to permit the jury to sort out the credibility of the statements.

c. Cross-examination of the victims at trial

Defendant argues that Young did not cross-examine Yun Yang and Xiaomin Chen with the vigor required by the Sixth Amendment. We disagree.

Yun Yang, the delivery person for the Yoan Fong restaurant, identified defendant as his assailant in court. He also recognized defendant's face at the scene of the crime, because "this guy had come to my restaurant many times."

The incident report from the night of the robbery contained Yang's statement to the effect that his assailant was a short, stocky, 200-pound black male. Using this limited description, the police questioned one black male at the scene. They transported another black male to the restaurant for a possible identification, but the identification was negative. Given that defendant weighed about 300 pounds at the time of the armed robberies, defendant argues that there should have been an attempt at trial to elicit from Yang a full description of the assailant's appearance on the night of the robbery. It is unclear how this cross-examination would have aided defendant.

Young chose to attack Yang's credibility in another manner. To comprehend Young's approach, it is necessary to elaborate on the testimony of Detective Harris. We have described the mechanics of the photo array. As noted, Harris testified that Yang signed the back of defendant's photograph after his positive

identification. Harris did not believe that Yang had
viewed any photographs prior to the viewing of the
photo array.

During cross-examination, Yang, however, could not
remember a specific procedure like that described by
Harris. Yang claimed to review thick photo albums
provided by the police. During his review of a third
photo album, Yang said he identified defendant's
picture as "[t]his guy, this man." Yang also disclaimed
any memory of signing the back of any photo.

Young relied on this contradictory testimony to
emphasize Yang's inability to remember the photo array
procedure and his erroneous statements about the photo
albums. Young attempted to discredit Yang's testimony,
and with that, Yang's in-court identification. This
approach was reflected in Young's final summation.

It is clear from the summation that Young wanted
to leverage Yang's incomplete description to
defendant's advantage. To weaken the strength of Yang's
in-court identification, Young noted the absence of any
previous description by Yang of his assailant. He
argued that "my recollection is you don't have any
identification that he ever gave. I don't recall there
being any testimony about what he may have told the
police about the description of the person that robbed
him." Young implied that Yang could not have described
the assailant on the night of the crime because there
was no observation; Yang simply picked out the only
black male in court to compensate for this deficiency.
We will not interfere with Young's strategic choice on
this matter.

Xiaomin Chen testified about the armed robbery of
the Kung Hing restaurant the night of defendant's
arrest. He testified that the assailant covered his
face with a ski mask. Chen did not provide an in-court
identification of the assailant.

Young conducted a brief cross-examination. He
asked Chen about the assailant's pants. He raised
Chen's prior identification of a man in "blue jeans" as
the assailant. At the time of this identification,
about 11:30 p.m., the alleged assailant sat in the back
of a police car.

Young relied on this limited testimony to point out serious flaws in the State's case. He wondered why defendant's arrest did not occur until 1:05 a.m. if there was a positive identification at 11:30 p.m. He pointed out that defendant was not wearing blue jeans on the night of his arrest. And, he asked the jury to consider the State's failure to produce police testimony to validate Chen's identification.

Defendant argues that there should have been an attempt to require Chen to describe the physical characteristics of the assailant. It appears, however, that Young did not probe Yang's memory because it could have backfired if, contrary to direct examination, Chen gave a physical description of the assailant consistent with defendant's traits. We attribute Young's avoidance of this possible pitfall to trial strategy.

Even if Young's representation fell below an objective standard of reasonableness, it is clear that there was no prejudice to defendant. There was sufficient evidence on which the jury could return a guilty verdict on this count. Chen's testimony did not fully link defendant with the crime. To accomplish that task, the State relied on defendant's confession to Detective Nide. It is clear that the jury assigned great weight to this evidence. The allegedly deficient cross-examination does not undermine confidence in the verdict.

### d. The stipulation

Defendant's pro se supplemental brief challenges Young's decision to stipulate to the fact that Yang did not identify defendant's picture from the photo albums. This stipulation was precipitated by the substance of Yang's unanticipated testimony. This did not constitute ineffective assistance. The stipulation effectively constituted an admission by the State that the jury could not believe part of Yang's testimony. And, Young emphasized Yang's inability to remember the photo array procedure. Given Yang's belief that he did not sign defendant's photograph at any time, and the conflict over the BCI numbers, the jury could conclude that the police rigged the identification procedure. There was no deficient attorney conduct in this regard.

### e. The discrepancy between Zhu's and Yang's descriptions

Defendant attached two police reports in support of his PCR petition. The first concerns the November 28 robbery of Tony Zhu at the Yoan Fong restaurant. The report relates the observations of an eyewitness, Jack Daily. Daily saw two black males running away from the restaurant. Although it is not clear whether Daily or Zhu provided this description, the report described the assailant as "5'10?, thin build." Zhu's in-court testimony about the assailant matched the description. The second police report concerned the December 22 robbery of Yun Yang. Yang described the assailant as a short, stocky black male. He identified defendant as the assailant at trial.

Defendant notes the inconsistency of these descriptions. He argues that "[t]he differing descriptions of the actor leads to the conclusion that two different persons were described.... Thus, a reasonable doubt is created as to whether the same individual committed these robberies." Defendant's observation is correct. But defendant fails to acknowledge that the jury resolved this discrepancy in favor of defendant on the first armed robbery count. The jury acquitted defendant on Count One, charging defendant with the November 28 armed robbery. It is probable that the jury relied on three facts: Zhu did not observe the assailant's face on that date; Zhu agreed, on cross-examination, with his earlier description of the assailant as a thin man; and the jury observed that defendant was not a thin man.

Assuming that Daily described the assailant he saw on November 28 as "5'10? thin build," and given the consistency between Zhu's prior statement and his testimony, there was no need to produce Daily or the investigating officer at trial. Even assuming that Young's failure to subpoena these individuals was unreasonable, there was no prejudice to defendant. The jury acquitted defendant of the crime witnessed by Daily.

...

          g. Inadequate investigation
    Defendant argues that Young did not conduct adequate investigation. With proper investigation, defendant alleges, in vague terms, he "could have mounted a successful defense based on

22

misidentification." This defense would be centered on the testimony of Daily, an eyewitness that counsel did not attempt to interview or subpoena.

There is no need to assess the reasonableness of counsel's investigative efforts. As we have stated, the failure to produce Daily did not prejudice defendant, given that the jury did not find, beyond a reasonable doubt, that defendant committed the crime witnessed by Daily.

Defendant does not allege that Young should have interviewed Daily, the resident of a nearby home, about Daily's possible observation of the other three armed robberies of Yoan Fong. As such, there is no claim that the failure to question Daily led to erroneous convictions on three of the armed robbery counts.

Assuming that there was no attempt to question Daily about the later robberies, it is difficult to attribute this oversight to "strategy." It is necessary to apprise oneself of the relevance of certain witness testimony prior to making an "educated" decision to withhold the testimony from the jury's consideration. ...

However, defendant does not make this argument. Thus, defendant did not comply with the clear procedural requirement that the proponent of an "inadequate investigation" claim "must assert the facts that an investigation would have revealed, supported by affidavits or certifications based upon the personal knowledge of the affiant or the person making the certification." ... These facts are not set forth and there is no need for us to conjecture.

State v. Jackson, 2009 WL 36393 at 5-11 (citations omitted).

The Counsel Clause of the Sixth Amendment provides that a criminal defendant "shall enjoy the right ... to have the Assistance of Counsel for his defence."  U.S. Const. amend. VI. The right to counsel is "the right to effective assistance of

counsel." <u>McMann v. Richardson</u>, 397 U.S. 759, 771 n.14 (1970) (emphasis added).

To prevail on a claim of ineffective assistance of counsel, a habeas petitioner must show both that his counsel's performance fell below an objective standard of reasonable professional assistance and that there is a reasonable probability that, but for counsel's unprofessional errors, the outcome would have been different. <u>Strickland v. Washington</u>, 466 U.S. 668, 687, 694 (1984). A "reasonable probability" is "a probability sufficient to undermine confidence in the outcome." <u>Strickland</u> at 694. Counsel's errors must have been "so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." <u>Id.</u> at 687. "When a defendant challenges a conviction, the question is whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt." <u>Id.</u> at 695.

The performance and prejudice prongs of <u>Strickland</u> may be addressed in either order, and "[i]f it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice ... that course should be followed." <u>Id.</u> at 697.

There is "a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." <u>Strickland</u>, 466 U.S. at 689. As a general matter, strategic choices made by counsel after a thorough investigation of the

24

facts and law are "virtually unchallengeable," though strategic choices "made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." Id. at 690-91.  If counsel has been deficient in any way, however, the habeas court must determine whether the cumulative effect of counsel's errors prejudiced the defendant within the meaning of Strickland.  See Berryman v. Morton, 100 F.3d 1089, 1101-02 (3d Cir. 1996).

The state courts correctly identified and applied the governing federal law regarding claims of ineffective assistance of trial counsel.  They thoroughly reviewed the facts regarding the police reports and identification procedures affecting Petitioner's trial as well as trial counsel's strategic decisions.  The state court decisions are neither contrary to nor an unreasonable application of the governing federal law, nor are the state court decisions based upon an unreasonable determination of the facts based upon the evidence presented. Petitioner is not entitled to federal habeas relief.

IV.  CERTIFICATE OF APPEALABILITY

Pursuant to 28 U.S.C. § 2253(c), unless a circuit justice or judge issues a certificate of appealability, an appeal may not be taken from a final order in a proceeding under 28 U.S.C. § 2254. A certificate of appealability may issue "only if the applicant

has made a substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2).  "A petitioner satisfies this standard by demonstrating that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further."  Miller-El v. Cockrell, 537 U.S. 322, 327 (2003).

Here, Petitioner has failed to make a substantial showing of the denial of a constitutional right.  Jurists of reason would not disagree with this Court's resolution of Petitioner's constitutional claims.  No certificate of appealability will issue.

## V.   CONCLUSION

For the reasons set forth above, the Petition will be denied.  An appropriate order follows.




                                         *S/ Dickinson R. Debevoise*
                                         Dickinson R. Debevoise
                                         United States District Judge

Dated: March 28, 2011

26